1-7-1-5-3-7 A.C. Castle Construction Co. Inc. v. R. Alexander Acosta, et al. Thank you. Mr. LeVault, good morning. Good morning. Good morning. May it please the Court, my name is Jim LeVault and I represent the petitioner, A.C. Castle Construction Co. Inc., and I'd like to reserve one minute for rebuttal. You may. The ALJ, in this case, erred in applying the Single Employer Doctrine and the Darden Employment Test by relying on evidence that does not satisfy the elements of either of those legal tests. The ALJ also failed to apply the Fair Notice Doctrine to preclude OSHA from considering A.C. Castle as the employer of the subcontractor for venture home improvement. First, with the Single Employer Doctrine, pursuant to long-standing Commission precedent, two related employers will be considered a single entity or a single employer where they meet three elements. First, they share a common work site. Two, they share common ownership, management, or supervision. And three, they both have interrelated and integrated operations. Can I ask you something? Sure. Which is probably related to the third issue that you just mentioned. What does the record show as to who exercised immediate supervision over the two employees that were injured? Mr. ProVenture. Time out, your honor. Mr. ProVenture was in charge of the work site, but the foreman at the time of the accident was Mr. Cormier. And who did he work for? He worked for ProVenture. And ProVenture paid him directly. Thank you. Sure. On the first issue, common work site, in all of the decisions cited by the parties and the judge, common work site means a common physical location where both entities carry out their day-to-day operations. Absolute Roofing found a common work site because the same business address and shared the same offices. Vergona Crane, both companies operated out of the same office. C.T. Taylor, companies operated out of the same office. Fabian Construction, both companies shared the same address. In this case, the judge was clearly troubling to the administrative law judge that your client, under penalty of perjury, submitted documents to the state. He was given the option in those documents of either describing Mr. ProVenture as a subcontractor or identifying him as an employee. And he chose to identify Mr. ProVenture as an employee. I gather he tried to walk away from that, said he hadn't really paid all that much attention to it and it had become a habit. He just did this routinely. But how in arguing for a different outcome can you overcome the very probative fact that he was swearing to the proposition that Mr. ProVenture was an employee of his four years? Yes, Your Honor. The optics of that are not good, but they are not relevant to the analysis of single employer. Because even though he may have, and his testimony on this was, hey, I always did it that way, but it was clearly erroneous. If you were to look at how the job site was actually run or their relationship was run, they had separate contracts. ProVenture provided workers' comp insurance. ProVenture provided all the supervision day to day. ProVenture paid directly these employees. All of that supports the fact that ProVenture was a separate employer. And the fact that he may have, and this is Mr. LeBlanc now, when filling out the applications for building permits, he made those erroneous statements. The purpose of those documents, and the record reflects this, is to ensure that when an entity pulls a building permit, there's actual workers' compensation insurance for the individuals who are actually working at the site. Mr. LeBlanc said, I don't really think about it because I knew that all of my subcontractors had workers' compensation insurance, and the same was true for ProVenture. In terms of Rutland, the record also establishes that in dealing with customers, Mr. Castle and Mr. ProVenture took pains to convey to the customers that they were dealing with Mr. Castle and his company, not Mr. ProVenture. They did not want customers to think that it was actually Mr. ProVenture who was somehow independently providing the roofing work. They wanted customers to understand that it was Castle that they were dealing with. They did not advertise to the customers that the actual work was being performed by the subcontractor. Again, the optics to the customer does not fall within the three-part element single-employer test. In fact, Mr. ProVenture did testify that not only did he work for A.C. Castle, but he worked for A.C. Castle customers after those jobs were done. So not all customers knew or were blind to the fact that... In doing non-roofing work, he said that they want these homeowners to know that he does non-roofing work in the hope that they might ask him to do non-roofing work. Wasn't he careful to make that point? He certainly did painting. That's what he was doing for these customers after the fact. How do you say that these factors that Judge Lopez is mentioning are not relevant to the three-factor test? Doesn't the fact that one of them describes the other as his employee go directly to whether there's common supervision because you supervise your own employee? Well, Your Honor, the facts show that he was not supervising ProVenture more than simply... There are facts that show that, but I think we're on substantial evidence review here. And so we're not asking are there facts that support your side, I think. Correct me if I'm wrong. I think we're asking is there substantial evidence that's right or wrong that supports the board's determination? And so I come back to Judge Lopez's two questions. Aren't those two facts that actually go on that side of the scale and therefore end the substantial test inquiry? Your Honor, neither of those facts fall within the category of evidence that define common ownership management or supervision. Well, sure, if you're holding yourself out to the state and you're holding yourself out to customers to be a certain way, one could conclude, you don't have to, but one could conclude that you are that way. Hence, there's something that goes in the scale over here. But the case law that interprets these factors, especially the factors of common ownership management or supervision, all talk about owners that have ownership in both entities, that they run the day-to-day operations of both entities... Right, that he's saying to customers in the state, I run this guy, ProVenture. But he actually doesn't. He actually doesn't. Well, you say that, but he says apparently your own client disagreed with you in a sworn statement, and the ALJ may have decided to believe him in his sworn statement rather than the points that he would fairly put on the other side of the scale. Well, Your Honor, this may be a good time to segue into fair notice, because the fair notice doctrine would prevent the deference to the ALJ in this case. From 2011 to 2014, AC Castle operated in the same exact fashion it operated on the date of the accident. And during that three-year time frame, OSHA inspected AC Castle job sites six times and was fully aware of AC Castle's presence, fully aware that AC Castle was holding itself out as the only contractor on site, saw the signage, did thorough investigations, and concluded six different times that the subcontractor was in fact the employer and not AC Castle. It was only on this day that the agency responded. This was a very serious accident, two people very seriously injured, and I think their response is, yeah, that's all true, but in investigating this very serious accident, we learned things that we had not known before. Are you saying that they are somehow estopped because previously they had accepted this contract or subcontract relationship, that they're now estopped, having learned all these new details from concluding that in fact they are operating as a single employer? Your Honor, it's not estoppel. It is fair notice, and that is based on due process. They can't be deprived of property. In this case, they are being penalized for the first time based on an interpretation of the Occupational Safety and Health Act as to who the employer is. And the previous inspections, one of them was a serious accident. So my time is up. Ms. Tyson? Tyrone. Tyrone. Tyrone, very good. Thank you. But you can't pronounce my name. I don't know. That's fine. Just stick with your honor. Good morning. May it please the Court. I'm Amy Tryon for the Secretary of Labor. A.C. Castle has presented the facts of this case as being just your typical general contract or subcontractor relationship. But that's not so, and that's the reason that we're here today. Mr. Provencher was not a legitimately functioning independent business entity. As a legal matter, he had no business or trade licenses. And as a practical matter, he had no money, no credit, and few, if any, materials of his own. As the ALJ found, Mr. Provencher acted as an arm of A.C. Castle. He did the work that Mr. LeBlanc assigned him in the order that Mr. LeBlanc told him to do it. He picked up and transported materials from the lumberyard that Mr. LeBlanc had approved the purchase of over the phone and that Mr. LeBlanc had paid for. When Mr. Provencher had a problem with one of his employees, he turned to Mr. LeBlanc and said, Hey, can you help me get rid of this guy? And when Mr. Provencher needed more people on his crew, which was a determination that Mr. LeBlanc made, Mr. LeBlanc placed and paid for the newspaper wall dads. There's one aspect of the decision that gave me a little pause when I was reading it, and that's a common worksite determination. It seems that instead of focusing on the location of the businesses, their operations, as in most of the cases, what the tribunal did here was decree that the common worksite was where the construction project was being done. And that would seem to say that the common worksite test would always, in 100% of the cases, be satisfied whatever you're dealing with the construction industry with a general and subs, because by definition, the general has hired the subs to work on the common worksite. Am I reading that correctly? Well, I think that where it could be said that the general contractor also performed work at the physical worksite, that yes, that would be true, but that's not a concern of spinning off into this. It's not just going to go and cite every general contractor and subcontractor under this, under single employer, as AC Castle expressed the concern of. And the reason for that, again, is that this was not a typical relationship. The commission has four times found single employer status. And the names of those cases are Altor, Advanced Specialty, Vergona Crane, and C.T. Taylor. This isn't something that comes up a whole lot. AC Castle relies also on two other cases, Cranesville Aggregate and Absolute Roofing, but those are unreviewed AIJ decisions that carry no precedential value. So it's true that in those four cases, the facts were different from those here. Those were companies that were owned by either the same person or members of the same family, and they did share office space. But the language of the element is common worksite. And that language and the language of the other two prongs of the test, as adopted by the commission, we believe is broad and flexible enough to encompass the facts here. And, in fact, this court has used language in prior cases stating that the single employer test should be applied. In the Torres-Negron case, this court said that the single employer test should be applied flexibly. And in Pentec Papers, the NLRB case, that the determination rests on all the circumstances of the case. Is there supervision? Who supervises the employees of some importance? Yes. One of the elements is common president ownership, management, or supervision. And the facts found by the ALJ pertaining to Mr. LeBlanc's, for example, Mr. LeBlanc, and this is especially relevant because this is an OSHAC case involving workplace safety, and I did want to add that because this is a workplace safety case, finding the common worksite to be where the physical labor was actually performed rather than where paperwork was done is especially relevant. But back to your question, Your Honor's question, the facts that the ALJ found supporting this common supervision management element pertained to Mr. LeBlanc's assignment of the jobs, telling Mr. Provencher what order to do them in, providing materials and equipment. And he also, Mr. LeBlanc, knew that Mr. Provencher used these rough spruce planks to make the scaffolds out of, even though they were almost two inches shy of the width that they needed to be, and he told Mr. Provencher to double those up, which indicates some awareness that they weren't strong enough to do the job on their own, and also indicates that he was involved in the day-to-day management. No, he was not there, Mr. Provencher was not there on the job that day, and as far as we know, was not at this time in his career performing roofing labor himself or being a physical on-site supervisor. Well, are you telling me that these two employees were there without any direct supervision? Not at all, Mr. Provencher was there, was their supervisor. He was gone part of the day. And he wasn't there? He was not there during the accident. Well, maybe, I'm sorry, I don't remember if he was there specifically during the accident. He was not there during the accident. That's right. He had left to purchase the planks, come back, and then it started raining, so he went again to buy a rain tarp when the accident occurred. Another man was acting as the foreman. And who did he work for? Well, the secretary, as we stated earlier... What does the record show as to who he worked for? Maybe it doesn't show anything. Well, the ALJ discredited his testimony about whether he worked. The ALJ didn't credit any of the employees' testimony about whether they worked for A.C. Castle or Mr. Provencher because she found that all of the employees' testimony was self-serving. That day he was under the supervision of Mr. Provencher, that's not in doubt. The question is whether Mr. Provencher himself was either so integrated with A.C. Castle as to be a single entity for the purposes of this case or, in the alternative which the ALJ found, that under Darden he was not really an independent subcontractor but a supervisory employee. All right, right before the accident, as I recall, somebody ordered or was in the process of doubling up the planks? There's no evidence as to that, Your Honor. The evidence is that Mr. Provencher testified that he, quote, always doubled up the planks and this plank was not doubled. And two, possibly three men were standing on it when it broke. So we didn't have a situation where they had put one plank up and were starting to put the second one down and that's when the ocean inspector showed up. The men were standing on the single plank 20 plus feet in the air and it broke. So the ALJ found those two. The legal question is whether A.C. Castle was the employer of the roofing workers at the site. And the ALJ found those two alternative theories, what the Secretary believes are alternative theories. She did fold them together a little bit, but we don't think that's any kind of reversible error. Could you shed some light? Doesn't the Secretary also have a multi-employer test, sort of like a joint liability? Yes. Why wasn't that just a slam dunk application here, avoiding everything? I believe the reason for that is that the multi-employer test, for A.C. Castle to have been a controlling employer under this test, you have to show knowledge and he wasn't there, Mr. LaVoie wasn't there. That's the short answer. And then back to the general sub, I take it this isn't done a lot, because the common, as we talked about earlier, the common workplace test under your definition is always going to be satisfied. And then the very definition of a general contractor is that's the entity that you hire to supervise the subs and direct and coordinate all the work. So there's, by definition in the nature of the job, there's going to be a lot of direction given from a general to subs. I take it we don't need to rely on that fact or the common work site alone to affirm you. We can go to these additional facts, like some of the ones Judge Lopez was mentioning. I think that's right. It's the language that the, I think the Third Circuit used saying that it's not, this is a question of looking at all the facts that relate to all the factors and drawing the conclusion. And they did want to highlight, because Casey Castle argued for a de novo review in their reply brief, this is a substantial evidence case. Pentec Papers is the site for that. Excuse me. Yes. When does a violation become willful? The standard in this circuit is a willful violation is when the employer either knew that the conduct violated the law or alternatively had a state of mind such that if he had known that it violated the law, he wouldn't have cared. And that's precisely the state of mind that Mr. ProVenture revealed when he testified, that even if he had known that these rough spruce planks were not suitable for building scaffolds with, he might have used them anyway because that's what he always did. And that's ample evidence to support the willful characterization. Would you comment on the fair notice issue, please? Yes. The case law holds that an employer can have a fair notice claim against, if OSHA has affirmatively represented to the employer in the past that it was in compliance with a certain standard, that OSHA can't come back and cite the employer for violating that standard without providing notice that its interpretation has changed. But we have nothing close to that kind of affirmative representation here. There are two times that OSHA had in the past cited ProVenture home improvements without also citing Casey Castle. Opposing counsel referred to six times. Four of those times were other purported subcontractors that we feel have no bearing on this case. But OSHA never told Casey Castle that it couldn't be cited alongside PHI. And it is well established that the secretary has prosecutorial discretion to cite for a violation, even if he had not cited for that violation in the past. And I did also want to point out that Casey Castle, in the past, had been cited along with a different purported subcontractor. So they weren't aware that that kind of citation could issue. Thank you. Thank you. Very briefly, Judge Soraya, you had a question about who was supervising on site. The judge did credit Mr. ProVenture's live testimony, and he said point blank that Pete Cormier was my foreman on the job, and Pete Cormier was the one who was setting up the fault protection devices when he saw the employees climb up, and he said, guys, you've got to double up the planks, and that's when the accident happened. That's in the record? I'm sorry. That is all in the record? Yes, all in the record. All in the record. Keep in mind on the common work site. Now, the commission cases, I'll say all three elements need to be considered in the common work site. Keep in mind AC Castle was at 12 Parsons Hill Road in July of 2014 to secure the contract, and in so doing he measured the home, but he never returned to that job site, and the work was done in October of 2014. They were never on site together, and that's a far stretch from the common work site elements that our case law provided. Thank you. Thank you.